**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------- x
BRYANT WILSON,                  :
                                :
          Plaintiff,            :
                                :
          v.                    :   Civil No. 3:18-cv-1680 (AWT)
                                :
NATHAN SOUCY, GREG HARKINS, THAI :
TRAN, and HELEN MCLELLAN,       :
                                :
          Defendants.           :
------------------------------- x
```

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Bryant Wilson ("Wilson") brings this action against Nathan Soucy ("Soucy"), Greg Harkins ("Harkins"), and Thai Tran ("Tran"), each of whom is a detective employed by the City of New Britain, Connecticut, and Helen McLellan ("McLellan"), an Assistant State's Attorney, claiming federal and state constitutional violations arising from examinations of his cellphone by New Britain police officers on August 29, 2014 and September 22, 2017.

This ruling addresses Wilson's claims that Soucy, Harkins, Tran, and McLellan violated his rights under the Fourth Amendment and Article First § 7 of the Connecticut Constitution. All other claims were dismissed in the Initial Review Order (ECF No. 10). McLellan, in one motion, and Soucy, Harkins, Tran, in another motion, have moved for summary judgment on Wilson's remaining claims. For the reasons set forth below, their motions

are being granted as to Soucy, Tran, and McLellan and denied as to Harkins.

## I.    FACTUAL BACKGROUND

On August 7, 2014, Tyrell Johnson ("Johnson") encountered Wilson at a club in New Britain. Wilson stated that he was planning to shoot and kill Cory Washington ("Washington") because of his affiliation with a rival gang.

On August 18, 2014, Johnson encountered Wilson again. Wilson reiterated that he was planning to shoot and kill Washington because of his affiliation with a rival gang. Wilson asked Johnson to drive him to Washington's house. Johnson refused. Later that day, Johnson went to Washington's residence at 62 Roberts Street to purchase marijuana. As Johnson was walking away, he heard three gunshots. When Johnson turned around, he saw Washington lying in the driveway at 62 Roberts Street, and a male who looked like Wilson running toward Bassett Street. Shortly thereafter, Johnson received a call from Wilson. Wilson was out of breath and asked Johnson to pick him up because he had just "done some shit." Johnson refused.

On August 18, 2014 at approximately 10:45 p.m., the New Britain Police Department received several calls reporting that a male had been shot in the area of 62 Roberts Street. Officers discovered Washington lying face down in the driveway at 62

Roberts Street. Washington had been shot once. He was transported to a hospital and there pronounced dead.

During an area search, officers discovered a single .44 caliber shell casing. Officers also found a black San Antonio Spurs hat stuck in the bushes immediately behind 62 Roberts Street. Jerrome Blackman, who was parked in the rear lot at 60 Roberts Street at the time of the shooting, reported hearing at that time footsteps of a single person running towards the rear of 60 Roberts Street, which was towards Bassett Street and the same path along which officers discovered the black San Antonio Spurs hat.

On August 19, 2014, Johnson encountered Wilson at a vigil for Washington. Wilson stated that he had shot and killed Washington.

On August 20, 2014 sometime around 10:15 p.m., Wilson knocked on the back door of the first floor at 213-215 Maple Street, which was the residence of his girlfriend, Josslin Kinsey ("Kinsey"). Kinsey and Wilson went to her bedroom briefly. Wilson accidentally left his cellphone in the bedroom when they went to the rear porch of 213-215 Maple Street to smoke cigarettes.

On August 21, 2014 at approximately 12:42 a.m., a surveillance camera located at 216 Maple Street recorded a sedan pulling in front of 216 Maple Street. The vehicle stopped for a

moment before being driven off. As the vehicle began to move, a male fired three gunshots toward the vehicle. Anonymous witnesses reported that Kinsey had been arguing with the occupants of the car and then punched the car, which was followed by Wilson telling Kinsey to watch out and then shooting at the departing vehicle.

On August 21, 2014 around the same time, the New Britain Police Department received a complaint about shots being fired in the area of 213-215 Maple Street. During an area search, officers discovered five .44 caliber shell casings. Officers found Wilson and Kinsey on the porch at 213-215 Maple Street and detained them. A gunshot residue test was performed on Wilson's hands. During the test, Wilson said that he likes to play with guns, and that he is familiar with .44 caliber handguns. The conversation eventually turned to Washington's murder. Soucy noted that Wilson grew increasingly agitated whenever Kinsey mentioned to the officers her friendship with Washington. Wilson and Kinsey were not taken into custody.

On August 21, 2014 at approximately 4:00 a.m., Kinsey was at her home when Wilson knocked on her window and asked her to come to his residence. Kinsey walked to his residence at 66 Prospect Street. Wilson fell asleep at approximately 4:40 a.m. and Kinsey fell asleep at approximately 6:00 a.m. Kinsey and

Wilson awoke at 8:00 a.m. Kinsey left 66 Prospect Street at approximately 8:10 a.m.

On August 21, 2014 at approximately 8:52 a.m., the New Britain Police Department received a call from the first-floor tenant at 66 Prospect Street reporting that a bullet had come through her bathroom ceiling from the second floor. Officers learned that Wilson resided on the second floor at 66 Prospect Street, and that Wilson was the only person present on the second floor at the time of the gunshot.

Autumn Angeloni witnessed Wilson running away from 66 Prospect Street towards School Street shortly after the shot was fired. Wilson fled to Kinsey's residence at 213-215 Maple Street. During an area search, officers located a .44 caliber handgun under a vehicle near 10 School Street, which is only a few houses away from 66 Prospect Street.

On August 21, 2014 at approximately 9:24 a.m., Soucy and three other officers went to 213-215 Maple Street trying to locate Wilson. Soucy encountered Kinsey at the front door of 213-215 Maple Street. She reported that Wilson was not there. Kinsey consented to a search of her home. Wilson was not found. Kinsey then agreed to go to the police station to be interviewed.

During the interview, Kinsey wrote and signed a sworn statement. Kinsey attested that Wilson accidentally "left his

cellphone at my house last night." Aff. of Josslin Kinsey
("Kinsey Aff.") at 8, ECF No. 55-4. Kinsey went on to attest
that "at about 8:40 a.m. today August 21, 2014, I went through
[Wilson's] cellphone. I saw that [Wilson] had a lot of text
messages with girls . . . . I was so mad I deleted all the text
messages." Id. Kinsey further attested that "I still have
[Wilson's] cellphone in my bedroom and [I am] willing to let the
police search [Wilson's] cellphone." Id. On August 21, 2014 at
2:37 p.m., Soucy and Tran accompanied Kinsey to 213-215 Maple
Street where she retrieved from on top of her bed a cellphone
that she stated belonged to Wilson. Kinsey informed them that
Wilson's cellphone was not password protected. Soucy took
possession of the cellphone and took it to the New Britain
police station.

    Kinsey also consented to a search of her cellphone by the
officers. In connection with that search, Kinsey signed a
consent form. She did not sign a consent form with respect to
Wilson's cellphone. Also, Wilson maintains that things such as
his GPS location, email messages, and cell tower location were
not left open on his cellphone, and that Kinsey did not have
access to 90% of the data on his cellphone.

    On August 22, 2014, Soucy tagged the cellphone, which was
model number LGMS323 with serial number 406CYWC969017, placed an
"investigative" hold on the cellphone, and secured it in an

evidence locker. Wilson was not aware that Kinsey had given his cellphone to Soucy. On August 26, 2014, Soucy attested to facts in support of an application for a search and seizure warrant authorizing a forensic examination of Wilson's cellphone in connection with the two incidents on August 21, 2014; the case number was 14-16285. The warrant application referenced pictures of Wilson holding a gun.

On August 29, 2014, a New Britain police officer, whose identity cannot be determined, conducted a forensic examination of Wilson's cellphone pursuant to the search warrant. The report of the examination compiled 41 contacts, 6 text messages, 500 logged calls, and 460 images.

On September 16, 2014, Tran applied for an arrest warrant for Wilson in connection with the August 21, 2014 incidents; the case number was 14-16285. In the application, Tran explained that Wilson had confessed to firing the shots at 213-215 Maple Street and to firing the shot at 66 Prospect Street. Wilson was arrested and interviewed. Wilson was asked about Washington's murder and maintained that he was not involved.

On November 26, 2014, an arrest warrant was issued for Wilson in connection with Washington's murder. In the application for the arrest warrant, Tran attested that he had "closely inspected" several photographs recovered from Wilson's cellphone showing Wilson wearing a black San Antonio Spurs hat

matching the one found in the bushes immediately behind 62 Roberts Street. Tran did not obtain a search warrant authorizing him to inspect the pictures from Wilson's cellphone as part of the investigation into Washington's murder, which was case number 14-16163. Rather, Tran relied on the search warrant previously obtained by Soucy in case number 14-16285.

Case number 14-16285 was resolved on December 12, 2016. Wilson was sentenced to a total effective sentence of imprisonment for twenty years.

McLellan was the prosecutor for Wilson's murder trial, which began in September 2017. In preparation for trial, McLellan contacted Tran concerning the initial examination of Wilson's cellphone. Tran directed McLellan to Harkins. At first, McLellan was under the mistaken belief that Harkins had conducted the 2014 examination of Wilson's cellphone. But when McLellan met with Harkins to review and conduct pretrial preparation of testimony regarding the 2014 examination of Wilson's cellphone, she learned that the New Britain police officer who performed the 2014 examination could not be identified. Consequently, McLellan requested that Harkins repeat the examination of Wilson's cellphone because McLellan was concerned about a potential Crawford confrontation issue if Harkins were to testify based on someone else's examination.

On September 22, 2017, at the request of McLellan, Harkins performed a forensic examination of the Wilson's cellphone to verify the results of the 2014 examination, and he also performed a "more comprehensive extraction." Local Rule 56(a)(1) Statement of Material Facts in Supp. of Mot. for Summ. J. ("Def.'s Statement of Facts") at ¶ 6, ECF No. 55-2. McLellan was given a full data report and, subsequently, a secondary case-specific extraction report that focused on information related to Washington's murder. The report of the examination compiled 88 contacts, 835 text messages, 521 logged calls, and 8781 images. The case number on Harkins' report was the one for the case in which Wilson was sentenced on December 12, 2016, i.e., 14-16285.

Wilson subsequently filed a motion to suppress the evidence resulting from Harkins' 2017 forensic analysis of his cellphone. Wilson argued that the August 26, 2014 warrant was issued in connection with the August 21, 2014 incidents, which were case number 14-16285, and did not encompass the investigation into Washington's murder, which was case number 14-16163. Wilson argued that the 2017 examination was a distinct search for new information, unconnected to the 2014 examination. After a hearing on September 28, 2017, the state court granted Wilson's motion to suppress.

On October 4, 2017, the state court held a hearing on the State's motion for reconsideration. McLellan argued that Tran viewed the photographs from Wilson's cellphone in connection with the August 21, 2014 incidents, case number 14-16285, and that Tran immediately recognized the photographs of Wilson wearing the black San Antonio Spurs hat found at the scene of Washington's murder, case number 14-16163. Therefore, McLellan argued, the plain view exception to the Fourth Amendment warrant requirement applied. Wilson argued that Tran did not merely stumble across the photographs recovered from Wilson's cellphone but was actively searching for evidence in connection with Washington's murder. The court denied the State's motion for reconsideration because the photographs at issue did not depict contraband and Tran did not have probable cause to believe that the photographs depicted contraband.

On October 25, 2017, Wilson was found guilty of Washington's murder and of carrying a pistol without a permit. Both convictions were in case number 14-16163. On January 3, 2018, Wilson was sentenced to fifty years in jail for Washington's murder, and five years in jail for carrying a pistol without a permit.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact

to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed R. Civ. P. 56(a). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. "[U]nsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).

Because the plaintiff in this case is proceeding pro se, the court must read the plaintiff's pleadings and other documents liberally and construe them in a manner most favorable to the plaintiff. See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Moreover, because the process of summary judgment is "not obvious to a layman," Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620 (2d Cir. 1999), the court must ensure that a pro se plaintiff understands the nature, consequences and obligations of summary judgment, see id. at 620-21. Thus, the court may itself notify the pro se plaintiff as to the nature of summary judgment; the court may find that the opposing parties memoranda in support of summary judgment provide adequate notice; or the court may determine, based on a thorough review of the record, that the pro se plaintiff understands the nature, consequences, and obligations of summary judgment. See id.

The court concludes that Wilson understands the nature, consequences, and obligations of summary judgment. First, Wilson was served with two notices to pro se litigants as required by Local Rule 56(b), one in connection with McLellan's motion for summary judgment, and another in connection with Soucy, Harkins, and Tran's motion for summary judgment. Second, Wilson's opposition reflects that he understands the nature and consequences of a motion for summary judgment. For example, Wilson states "[t]he [d]efendant's are not entitled to summary

-12-

judgment in this case. After reading all the defendants'
defenses and their version of the facts there will be a number
of material facts in dispute." See Pl.'s Mem. of Law in Opp'n to
Def.'s Mot. for Summ. J. ("Pl.'s Mem.") at 3, ECF No. 60. Third,
Wilson submitted a complete response to the defendants' motions,
which indicates that he understands the summary judgment
process, notwithstanding the fact that he is unable to overcome
the deficiencies in his case and create a genuine issue of
material fact.

## III. DISCUSSION

### A.   McLellan: Absolute Immunity

McLellan has moved for summary judgment on the grounds,
inter alia, that she is entitled to absolute immunity and
qualified immunity. The court finds that McLellan is protected
by absolute immunity for her work as a prosecutor at issue here.

Prosecutors receive absolute immunity from suit under
§ 1983 when they engage in "advocacy conduct that is 'intimately
associated with the judicial phase of the criminal process.'"
Giraldo v. Kessler, 694 F.3d 161, 165 (2d Cir. 2012) (quoting
Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). "Prosecutorial
immunity from § 1983 liability is broadly defined, covering
'virtually all acts, regardless of motivation, associated with
[the prosecutor's] function as an advocate.'" Hill v. City of
N.Y., 45 F.3d 653, 661 (2d Cir. 1995) (quoting Dory v. Ryan, 25

F.3d 81, 83 (2d Cir. 1994)). Prosecutorial immunity "encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation." Barrett v. United States, 798 F.2d 565, 571-72 (2d Cir. 1986).

Moreover, "[a]bsolute immunity applies to protect the prosecutor even in the face of a complaint's allegations of malicious or corrupt intent behind the acts." Giraldo, 694 F.3d at 166 (citing Burns v. Reed, 500 U.S. 478, 489-90 (1991)). "[A]bsolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, . . . because '[t]he immunity attaches to [the prosecutor's] function, not to the manner in which he [or she] performed it.'" Dory, 25 F.3d at 83 (quoting Barrett, 798 F.2d at 573).

To determine whether absolute immunity applies, the Second Circuit utilizes a "functional approach" in which the court must determine whether the function being performed is "intimately associated with the judicial phase of the criminal process." Imbler, 424 U.S. at 430; see also Hill, 45 F.3d at 662 ("[T]he 'functional' test for absolute immunity is an objective one; it does not depend upon the state actor's subjective intent."). Examples of "intimately associated" prosecutorial acts include "initiating a prosecution and presenting the case at trial" and "conduct in preparing for those functions", such as "evaluating

and organizing evidence for presentation at trial" and
"determining which offenses are to be charged." Hill, 45 F.3d at
661 (citing cases); see also Turner v. Boyle, 116 F. Supp. 3d
58, 79 (D. Conn. 2015) (list of examples). Moreover, "[a]
prosecutor enjoys absolute immunity even when doing an
administrative act if the act is done in the performance of an
advocacy function." D'Alessandro v. City of N.Y., 713 F. App'x
1, 7 (2d Cir. 2017) (quoting Warney v. Monroe Cty., 587 F.3d
113, 124 (2d Cir. 2009)).

McLellan is protected by absolute immunity with respect to
her decision to pursue a second examination of Wilson's
cellphone, even though Wilson disputes McLellan's motivation for
doing so. The only conclusion that can be supported by the
record here is that the function being performed by McLellan was
evaluating and organizing evidence for presentation at trial.
McLellan requested that Harkins repeat the examination of
Wilson's cellphone and verify the results of the 2014
examination and also perform a more comprehensive extraction so
Harkins could testify, based on personal knowledge, about that
evidence at Wilson's murder trial. See Def. McLellan's Statement
of Material Facts Not in Dispute Pursuant to Local Rule 56(a)(1)
("Def.'s Statement of Facts II") at ¶ 5-6, ECF No. 56-4.

Wilson contends that McLellan, functioning beyond the
judicial phase of the criminal process, directed Harkins to

examine his cellphone for the purpose of retrieving new information, such as call logs and contacts. See Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mem. II") at 9-10, ECF No. 58. In his opposition, Wilson relies on testimony by Harkins during the murder trial on September 28, 2017. See Pl.'s Ex., ECF No. 13. Harkins testified that, at McLellan's request, he "check[ed] a specific phone number contact name and produce[d] certain photographs [from Wilson's cellphone]" and "verif[ied] whether . . . there were any incoming or outgoing calls [from Wilson's cellphone] to a particular phone number." Id. at 26, 28. The testimony shows clearly that Harkins was evaluating and organizing evidence at McLellan's request. The fact that the evidence was subsequently suppressed does not change that fact.

Relying on the same testimony by Harkins, Wilson contends that McLellan is not protected by absolute immunity because she was "engaged in other tasks such as investigative and administrative tasks." Pl.'s Mem. II at 10. However, assuming arguendo that McLellan's request to Harkins that he examine Wilson's cellphone was an administrative or investigatory act, it was done in the performance of an advocacy function, i.e., preparation for trial, so McLellan enjoys absolute immunity for that act. See D'Alessandro, 713 F. App'x at 7.

Accordingly, McLellan is protected by absolute immunity for the acts taken by her as a prosecutor at issue here. Because McLellan is protected by absolute immunity, the court does not address whether she is also protected by qualified immunity, nor whether Article First § 7 of the Connecticut Constitution provides a private cause of action against prosecutors.

## B.    Soucy and Tran: Statute of Limitations; Lack of Personal Involvement

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013) (citing numerous cases). A plaintiff can establish personal involvement by demonstrating that the defendant: "(i) personally participated in the alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring." Provost v. City of Newburgh, 262 F.3d 146, 154 (2d Cir. 2001) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).[1]

---

[1] "Since [Ashcroft v. Iqbal, 556 U.S. 662 (2009)], some districts courts within this circuit have determined that not all five of Colon's categories of conduct that may give rise to

Here, the claimed constitutional violations are the examinations of Wilson's cellphone in 2014 and 2017 as part of the investigation of Washington's murder. However, Soucy never examined Wilson's cellphone for any reason. Soucy merely collected Wilson's cellphone from Kinsey, tagged it, and stored it in an evidence locker at the New Britain police station. Soucy was not involved in Tran's inspection of several photographs recovered from the cellphone in 2014, and he was not involved in Harkin's forensic examination of the cellphone in 2017. Therefore, Soucy's personal involvement in a claimed

---

supervisory liability remain viable." Ziemba v. Lajoie, No. 3:11CV845 SRU, 2012 WL 4372245, at *3 (D. Conn. Sept. 24, 2012). The court finds persuasive the reasoning in cases which conclude that the applicability of Iqbal is limited to cases involving discriminatory intent. See, e.g., Delgado v. Bezio, No. 09 CIV. 6899 LTS, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) ("'It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected [in Iqbal] the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.'" (quoting Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009))). "Thus, where the claim does not require a showing of discriminatory intent, the Colon analysis should still apply, insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.'" Ziemba, 2012 WL 4372245, at *3 (quoting Delgado, 2011 WL 1842294, at *9).
     Wilson does not allege that Soucy, Harkins, Tran, or McLellan acted with discriminatory intent. Also, Wilson's § 1983 claim, grounded in the Fourth Amendment, differs from intentional discrimination claims like the claim in Iqbal. Accordingly, the court concludes that the Colon standard applies in this case.

constitutional violation cannot be shown, and he is entitled to summary judgment.

The only claim of personal involvement in a constitutional violation by Tran is that sometime before Tran submitted the arrest warrant on November 26, 2014, he "closely inspected" several photographs recovered from Wilson's cellphone depicting Wilson wearing a black San Antonio Spurs hat.

"Since Congress did not enact a statute of limitations governing actions brought under § 1983, the courts must borrow a state statute of limitations." Lounsbury v. Jeffries, 25 F.3d 131, 133 (2d Cir. 1994) (citing Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 461 (1975)). In Connecticut, the applicable statute of limitations for § 1983 claims is Conn. Gen. Stat. § 52-577, which provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." Lounsbury, 25 F.3d at 133.

Wilson did not file his first complaint -- which did not name Tran as a defendant -- in this action until October 9, 2018, and he did not file his second amended complaint -- in which he first named Tran as a defendant -- until April 26, 2019. See Compl. at 1, ECF No. 1; Second Am. Compl. at 1, ECF No. 30. However, the three-year statute of limitations ran as to Tran by no later than November 26, 2017. Therefore, Wilson's

claim against Tran for his conduct in 2014 is time-barred, and Tran is entitled to summary judgment.

### C.   Consensual Search; Qualified Immunity

#### 1.   Consensual Search Need Not Be Pleaded Affirmatively

Soucy, Harkins, and Tran argue "that any examination conducted on the Plaintiff's cellphone data did not implicate the warrant requirement of the Fourth Amendment, or Article First, § 7, as the cellphone was voluntarily surrendered to Detective Soucy by the Plaintiff's girlfriend, Josslin Kinsey, who, at the time, was the lawful custodian of Plaintiff's cellphone and also, at the time, possessed the apparent authority to cede the cellphone and its digital data to Detective Soucy." Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 15, ECF No. 55-1. Wilson contends that Soucy, Harkins, and Tran are precluded from relying on the consent exception to the Fourth Amendment warrant requirement because they failed to plead it as an affirmative defense in their answer. See Pl.'s Mem. at 13.

However, in Ruggiero v. Krzeminski, 928 F.2d 558 (2d Cir. 1991), the Second Circuit held that the exceptions to the warrant requirement of the Fourth Amendment need not be pleaded affirmatively by the defense in § 1983 cases:

> The Ruggieros, on cross-appeal, maintain that the trial judge erred by failing to instruct the jury that

the burden of proving the exceptions to the fourth
amendment warrant requirement rested on the
defendants. Because the defendants withdrew the
affirmative defense of consent and failed to plead
affirmatively the defense of "plain view," the
Ruggieros also assert that the district court erred in
allowing consent and "plain view" to be considered by
the jury. We find the Ruggieros' contention regarding
the allocation of the burden of proof to be without
merit and consequently conclude that the exceptions
need not be pleaded affirmatively by the defense.

Id. at 562. The rationale for the holding in Ruggiero was as

follows:

It is true that searches and seizures conducted
without warrants are presumptively unreasonable. The
operation of this presumption, contrary to the
Ruggieros' contention, cannot serve to place on the
defendant the burden of proving that the official
action was reasonable. Rather, the presumption may
cast upon the defendant the duty of producing evidence
of consent or search incident to an arrest or other
exceptions to the warrant requirement. However, the
ultimate risk of nonpersuasion must remain squarely on
the plaintiff in accordance with established
principles governing civil trials. We see no reason to
depart from the usual allocation of burdens in a civil
trial.

Id. at 563 (internal citations omitted).

The court notes that in Tirreno v. Mott, 375 F. App'x 140

(2d Cir. 2010), the court observed that "the law of this Circuit

is not clear in assigning the burden of proof regarding consent

in a § 1983 action for unlawful search." Id. at 142. In Tirreno,

Ruggiero is quoted and discussed extensively with approval, and

the court stated:

This court has never overruled Ruggiero and continues
to cite it approvingly. See, e.g., Tierney v.

> Davidson, 133 F.3d 189, 196 (2d Cir. 1998)
> (distinguishing between criminal and civil cases as to
> which party bears burden of proof when reasonableness
> of warrantless search is at issue).

Id. The court continued though:

> Nevertheless, we failed to distinguish it or even to
> cite it in Anobile v. Pelligrino, 303 F.3d 107 (2d
> Cir. 2002), a § 1983 case relied on by plaintiffs here
> for its conclusory observation that "[t]he official
> claiming that a search was consensual has the burden
> of demonstrating that the consent was given freely and
> voluntarily," id. at 124 (citing Schneckloth v.
> Bustamonte, 412 U.S. 218, 222 (1973) (articulating
> government's burden in criminal case on motion to
> suppress evidence of warrantless search)).

Id.

More recently, however, the Second Circuit relied on

Ruggiero without referring to any tension between its analysis

and the language in Anobile:

> With respect to Thompson's challenge to the jury
> instruction assigning him the burden of proof with
> respect to whether exigent circumstances authorized
> the police officers' warrantless search of his
> apartment, we find no error. In Ruggiero v.
> Krzeminski, 928 F.2d 558 (2d Cir. 1991), we held that
> a warrantless search, though presumptively
> unreasonable, "cannot serve to place on the defendant
> the burden of proving that the official action was
> reasonable." Id. at 563; see also Harris v. O'Hare,
> 770 F.3d 224, 234 n.3 (2d Cir. 2014) ("Of course, as
> in all civil cases, 'the ultimate risk of non-
> persuasion must remain squarely on the plaintiff in
> accordance with established principles governing civil
> trials.'" (quoting Ruggiero, 928 F.2d at 563)).

Thompson v. Clark, 794 F. App'x 140, 142 (2d Cir. 2020).

Because Ruggiero is directly on point, Anobile cites to

Schneckloth which involves a motion to suppress evidence in a

criminal case, and Ruggiero continues to be cited approvingly by
the Second Circuit, the court applies the holding in Ruggiero
here.

Therefore, the court concludes that Soucy, Harkins, and
Tran are not precluded from arguing that they are entitled to
summary judgment because the search of Wilson's cellphone was
consensual.

### 2.    Voluntary Third-Party Consent

The Fourth Amendment protects "[t]he right of the people to
be secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures . . . . " U.S. Const. amend.
IV. "When an individual 'seeks to preserve something as
private,' and his expectation of privacy is 'one that society is
prepared to recognize as reasonable,' [the Supreme Court] ha[s]
held that [state] intrusion into that private sphere generally
qualifies as a search and requires a warrant supported by
probable cause." United States v. Carpenter, 138 S. Ct. 2206,
2213 (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)). "The
touchstone of the Fourth Amendment is reasonableness . . . ."
United States v. Ganias, 824 F.3d 199 (2d Cir. 2016) (en banc)
(quoting United States v. Miller, 430 F.3d 93, 97 (2d Cir.
2005)). However, "certain categories of permissible warrantless
searches have long been recognized." Fernandez v. California,
571 U.S. 292, 298 (2014).

Likewise, Article First § 7 of the Connecticut Constitution guarantees that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; . . . " Conn. Const. art. 1 § 7. "Since [A]rticle [F]irst, § 7, of the state constitution is couched in the same language as the [F]ourth [A]mendment, it should be accorded the same interpretation." State v. Mills, 57 Conn. App. 202, 216 (2000) (citations omitted) (quoting Ajello v. Hartford Fed. Sav. & Loan Ass'n, 32 Conn. Supp. 198, 207 (Conn. Super. Ct. Sept. 15, 1975)); see also State v. Skok, 318 Conn. 699, 707 (2015) ("To determine whether a defendant has a reasonable expectation of privacy" within Article First § 7, Connecticut state courts "use the two part test that Justice Harlan set forth in his concurrence in Katz."). Accordingly, a search or seizure for purposes of the Fourth Amendment is a search or seizure for purposes of Article First § 7.

A search pursuant to voluntary consent is a well-recognized exception to the warrant requirement. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 228, 231-32 (1973) ("Consent searches are part of the standard investigatory techniques of law enforcement agencies" and are a "constitutionally permissible and wholly legitimate aspect of effective police activity."). Where "consent [is] the product of an essentially free and unconstrained choice by its maker," then "a search conducted on

the basis of consent is not an unreasonable search." <u>United States v. Moreno</u>, 701 F.3d 64, 72, 76 (2d Cir. 2012).

"[W]hen [officials] seeks to justify a warrantless search by proof of voluntary consent, [they are] not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." <u>United States v. Matlock</u>, 415 U.S. 164, 171 (1974) (footnote omitted).

"[T]hird-party consent to a search will validate the search if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." <u>United States v. Davis</u>, 967 F.2d 84, 87 (2d Cir.), <u>cert. denied</u>, 506 U.S. 928 (1992).

As to the first prong, <u>Davis</u> provides a pertinent example of access to the area searched:

> With respect to the first prong, it is obvious that Cleare had "access" to the trunk -- he lived in the apartment and he kept the trunk, which belonged to him, in his own bedroom. He testified that he could open the trunk any time he wanted "if [he] had to get into it," and that, while he allowed Content to store some items in the footlocker, he and Content had never made any agreement that Cleare could not look inside. That Cleare had given Content the only key did not, in this case, diminish Cleare's access to the footlocker, particularly where the lock could be opened easily with other keys.

Id. at 87 (footnote omitted).

As to the first way to satisfy the second prong under Davis, in Matlock, the Supreme Court defined common authority as follows:

> Common authority is, of course, not to be implied from
> the mere property interest a third party has in the
> property. The authority which justifies the third-
> party consent does not rest upon the law of property,
> with its attendant historical and legal refinements,
> but rests rather on mutual use of the property by
> persons generally having joint access or control for
> most purposes, so that it is reasonable to recognize
> that any of the co-inhabitants has the right to permit
> the inspection in his own right and that the others
> have assumed the risk that one of their number might
> permit the common area to be searched.

Id. at 171 n.7 (internal citations omitted).

As to the second way to satisfy the second prong under Davis, "no case in this circuit has yet defined what constitutes a 'substantial interest' for purposes of the Davis test[.]" Moore v. Andreno, 505 F.3d 203, 211 (2d Cir. 2007). "It would be inconsistent with th[e] principles [in Matlock] to define 'substantial interest' in terms of a property interest alone, particularly in a case in which the third party lacked common authority and joint access, and in which the property interest itself was purely speculative." Moore, 505 F.3d at 211 (internal footnote omitted). The court's analysis included the following:

> In Davis, the court determined that Cleare, the
> consenting party, had a substantial interest in the
> searched container based on the fact that "it was his
> trunk and he kept personal items of some importance in

it." 967 F.2d at 87. But in addition to Cleare's
property interest in the trunk and in the items
contained therein -- and consistent with the spirit of
Matlock -- the elements of mutual use, joint access,
control, and assumption of risk were also present[.]

Moore, 505 F.3d at 211.

As to the third way to satisfy the second prong in Davis,

in United States v. McGee, 564 F.3d 136 (2d Cir. 2009), the

court stated the following about permission to gain access:

Whether a so-called "third party," i.e., one whose
access depends on the approval of the person who owns
the formal right of possession, has access to a
premises depends on the understandings communicated by
the titular owner to that person. The presence or
absence of locks on doors can be helpful to the
court's discernment of that understanding, but does
not directly answer it. For example, if in Moore there
had been no lock on the study door, but the owner had
made clear to his live-in girlfriend that his study
was his private place which she was never to enter, we
would think the result of the case would have been the
same.

Id. at 140.

However, "even if the person giving consent in fact lacked

authority to do so, the consent may nonetheless validate the

search if the person reasonably appeared to the police to

possess authority to consent to the search." McGee, 564 F.3d at

139. In Ojudun, the Second Circuit explained:

The requirement imposed by the Fourth Amendment's
touchstone of reasonableness "is not that the
[officers] always be correct, but that they always be
reasonable." Thus, where the person who gave consent
did not have actual authority, the question is
"whether the officers reasonably believed that he had
the authority to consent."

United States v. Ojudun, 915 F.3d 875, 883 (2d Cir. 2019)
(quoting Illinois v. Rodriguez, 497 U.S. 177, 185-86, 189
(1990)) (internal citations omitted).

As to the first prong of the test under Davis, i.e., access
to the area searched, there is no genuine issue as to the fact
that Kinsey had access to certain contents of Wilson's
cellphone. While Kinsey did not own the cellphone, she possessed
it for a significant period of time without Wilson making any
effort to assert control. Wilson had left his cellphone in
Kinsey's bedroom for several hours before it was turned over to
Soucy. During that period of time, Kinsey had access to the text
messages and not only viewed Wilson's text messages but also
deleted a number of them. However, Wilson maintains that Kinsey
did not have access to 90% of the data on his cellphone, and
drawing inferences in his favor that would include data obtained
by Harkins during his forensic examination. The defendants do
not respond to this assertion by Wilson. Thus genuine issues of
material fact remain with respect to the first prong of the test
under Davis.

The second prong of the inquiry is whether Kinsey had the
authority to give consent, or alternatively, reasonably appeared
to the police to have the authority to give consent.  The
defendants address this prong with respect to Soucy, but not
with respect to Harkins. The defendants argue that it was

-28-

reasonable to conclude that Kinsey had authority to give consent because "[g]iven that Ms. Kinsey and [Wilson] at the time were in a romantic relationship, it was reasonable . . . to conclude that [Wilson] would expect Ms. Kinsey might utilize the cellphone and view its digital contents. This is obvious given that Plaintiff choose to leave the cellphone in the sole custody of Ms. Kinsey for several hours and did not return to retrieve it from Ms. Kinsey, and the fact that Mr. Wilson chose not to enable a password on his cellphone to shield his data from Ms. Kinsey. Even if Plaintiff had enabled a password on his cellphone that was perfunctory . . ., the very fact that Mr. Wilson turned on the password protection feature of the cellphone at all, even to be easily bypassed, would have put Detective Soucy on notice that Plaintiff did not wish to allow Ms. Kinsey access to the digital contents in the event she obtained access to the cellphone." Defs.' Mem. at 16.

Wilson contends that genuine issues of material fact exist as to whether Kinsey had authority to consent to a search of his cellphone, and also as to whether Kinsey reasonably appeared to have the authority to consent to such a search. The court agrees. Wilson points out that Kinsey told Soucy that Wilson accidentally left his cellphone at her home, and he argues that this suggests that he did not give anyone permission to use his cellphone. He also points out that Kinsey never told Soucy that

she accessed the cellphone for her personal use. Rather, Kinsey
told Soucy that she accessed the cellphone to read and delete
text messages between Wilson and other women. Soucy also knew
that Wilson and Kinsey were in a romantic relationship at the
time she read those text messages, and Kinsey stated that she
was "mad" when reviewing the messages with other women. In
addition, Wilson points out that Kinsey did not have access to
90% of the data on his cellphone, and that the shots fired case
was closed well before Harkins conducted his forensic
examination of the cellphone. Wilson argues, moreover, that
Harkins did not rely on any voluntary consent by Kinsey.

### 3.   Qualified Immunity

The defendants also argue that Harkins is entitled to
qualified immunity.[2]

"Qualified immunity shields federal and state officials
from money damages unless a plaintiff pleads facts showing (1)
that the official violated a statutory or constitutional right,
and (2) that the right was 'clearly established' at the time of
the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735
(2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

---

[2] The issue of qualified immunity is not addressed with
respect to Soucy because he was not personally involved in
either forensic examination of Wilson's cellphone, and not
addressed with respect to Tran because he engaged in no relevant
conduct within the applicable limitations period.

"[L]ower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

A right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would [have understood] that what he [was] doing violate[d] that right.'" al-Kidd, 563 U.S. at 741 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). There is no requirement that a case have been decided which is "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Id. The Supreme Court has "previously explained that the right allegedly violated must be established, 'not as a broad general proposition,' but in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official[.]" Reichle v. Howards, 566 U.S. 658, 665 (2012) (quoting Anderson, 438 U.S. at 639). "[T]he clearly established right must be defined with specificity." City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019). "Specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Id. The "demanding standard [of qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the

law.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The defendant bears the burden of demonstrating that he is entitled to qualified immunity. See, e.g., Outlaw v. City of Hartford, 884 F.3d 351, 370 (2d Cir. 2018). Also, at the summary judgment stage, "the moving party bears the initial burden of establishing that there are no genuine issues of material fact." Weinstock, 224 F.3d at 41.

The defendants make no argument in support of their position that Harkins, as opposed to other officers, is entitled to qualified immunity, even though the plaintiff, who is proceeding pro se, submitted a detailed analysis on that issue in his opposition. Harkins must do more than merely allude to the fact that he is entitled to qualified immunity to meet his initial burden at the summary judgment stage as well as his burden of demonstrating that he is entitled to the affirmative defense of qualified immunity. Cf. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. . . . [A] litigant has an obligation to spell out its arguments squarely and distinctly . . . ." (internal quotation marks omitted)).

**IV.   CONCLUSION**

For the foregoing reasons, McLellan's motion for summary judgment (ECF No. 56) is hereby GRANTED. Soucy, Harkins, and Tran's motion for summary judgment (ECF No. 55) is hereby GRANTED in part and DENIED in part. The motion is granted as to the claims against Soucy and Tran. It is denied as to the claim against Harkins.

It is so ordered.

Dated this 28th day of September 2020, at Hartford, Connecticut.

/s/AWT
_____
Alvin W. Thompson
United States District Judge
